Reversed and remanded by published opinion. Judge THACKER wrote the opinion, in which Judge FLOYD joined. Judge AGEE wrote a dissenting opinion.
THACKER, Circuit Judge:
Petitioner William Leroy Barnes (“Barnes”), an inmate on North Carolina’s death-row, appeals the district court’s denial of his petition for writ of habeas corpus against Carlton Joyner, Warden of the Central Prison in Raleigh, North Carolina (hereinafter, the “State”). In 1994, after a jury trial in North Carolina state court, Barnes was convicted of first-degree murder and sentenced to death. Immediately after the jury returned its sentencing recommendation, Barnes alleged to the state trial judge that one of the jurors discussed the death penalty with her pastor the previous day. The trial court denied Barnes’ request to inquire further into the matter. The Supreme Court of North Carolina affirmed Barnes’ conviction and sentence on direct appeal, concluding, among other things, that Barnes had not proven that the alleged contact between the juror and her pastor prejudiced Barnes or denied him the right to an impartial jury.
In February 1999, Barnes sought state post-conviction relief on various grounds by filing a Motion for Appropriate Relief. In his Motion for Appropriate Relief, Barnes reasserted his claim of juror misconduct and presented additional evidence to demonstrate that a sitting juror improperly communicated with her pastor about the death penalty during the sentencing phase of Barnes’ trial and then relayed the information to other jurors. Despite this additional information, the state post-conviction court summarily denied Barnes’ claim without conducting an evidentiary hearing, adopting the same analysis as the Supreme Court of North Carolina.
After considering the various arguments raised in Barnes’ federal habeas petition, the district court concluded that the state court’s adjudication of Barnes’ juror misconduct claim was not contrary to, or an unreasonable application of, clearly established federal law. However, the district court granted a certificate of appealability, pursuant to 28 U.S.C. § 2253(c)(2), on the issue of whether a juror’s contact with her pastor violated Barnes’ Sixth Amendment right to a fair trial.
For the reasons that follow, we conclude that the state post-conviction court’s failure to apply a presumption of prejudice and failure, to investigate Barnes’ juror misconduct claim, which was based on an external influence on the jury, was an unreasonable application of clearly established federal law. Therefore, we reverse the district court’s judgment and remand for an evidentiary hearing to determine whether the state court’s failures had a substantial and injurious effect or influence on the jury’s verdict.
I.
A.
On October 30, 1992, at around 12:30 a.m., police officers from Salisbury, North Carolina, found B.P. and Ruby Tutterow shot to death in their home. The house was ransacked, and a number of the Tutterows’ belongings were missing. Later *233 that day, Barnes and his co-defendants, Frank Junior Chambers and Robert Lewis Blakney, were arrested in connection with the killings. Each defendant was subsequently indicted on two counts of first-degree murder, two counts of robbery with a dangerous weapon, and one count of first-degree burglary. After a joint capital trial, the jury returned verdicts finding Barnes and his co-defendants guilty of all charges, including first-degree murder on the theory of premeditation and under the felony murder rule. Barnes’ guilt is not at issue here.[1]
This capital trial proceeded to the sentencing phase, where the jury was charged with determining whether the crimes committed by Barnes and his co-defendants warranted a sentence of death or of life imprisonment. See N.C. Gen.Stat. § ISA-2000. During the closing arguments of the sentencing phase, an attorney representing co-defendant Chambers stated, in pertinent part, as follows:
If you’re a true believer and you believe that Frank Chambers will have a second judgment day, then we know that all of us will too. All of us will stand in judgment one day. And what words is it that a true believer wants to hear? [“JWell done, my good and faithful servant. You have done good things with your life. You have done good deeds. Enter into the Kingdom of Heaven.[”] Isn’t that what a true believer wants to hear? Or does a true believer want to explain to God, [“]yes, I did violate one of your commandments. Yes, I know they are not the ten suggestions. They are the ten commandments. I know it says, Thou shalt not kill, but I did it because the laws of man said I could. [”] You can never justify violating a law of God by saying the laws of man allowed it. If there is a higher God and a higher law, I would say not.
To be placed in the predicament that the State has asked you to place yourself in, is just that. To explain when your soul is at stake. [“JYes, I know the three that I killed were three creatures of yours, God. And that you made them in your likeness. I know you love us all, but I killed them because the State of North Carolina said I could.[”] Who wants to be placed in that position? I hope none of us. And may God have mercy on us all.
J.A. 1532-33.[2] The prosecution did not object at any point during this argument.
The next day, the jury recommended that Barnes and Chambers be sentenced to death for each murder and that Blakney be sentenced to a mandatory term of life imprisonment for each murder. After the jury returned its sentencing recommendations and exited the courtroom, the following colloquy took place between the court and defense counsel:
THE COURT: I take it everyone wants to enter some Notice of Appeal. Is that correct?
MR. HARP [CHAMBERS’ COUNSEL]: The first thing we would like to get in is that late yesterday afternoon we were informed, after talking to alternate jurors, that on Tuesday, before deliberation and before instructions were given by the Court, one of the jurors carried a Bible back into the jury room and read to the other jurors from that. *234 That it was also discovered by us that one of the jurors, one of the other jurors, called a member of the clergy, perhaps a relative of hers, to ask her about a particular question as to the death penalty. We also informed you of it this morning at ten o’clock and that we need to enter that on the record for purposes of preserving that.
MR. FRITTS [BARNES’ COUNSEL]: Judge, for Mr. Barnes we join in on that. We would for those reasons make a Motion for Mistrial and we would request the Court to inquire of the jurors, and I understand the Court’s feelings on that, but that would be our request. THE COURT: No evidence that anybody discussed the particular facts of this case with anybody outside the jury. Is that correct?
MR. HARP: No evidence that they did or did not as far as the conversation with the minister is concerned.
THE COURT: No evidence that they did though. Is that correct?
MR. HARP: No, sir.
THE COURT: All right. Well, I’m going to deny the request to start questioning this jury about what may or may not have taken place during their deliberations of this trial.
J.A. 1601-03. Thereafter, the trial court denied the defense’s post-sentence motions and rejected their request to conduct an evidentiary hearing with respect to juror misconduct.
On March 10, 1994, the court sentenced Barnes and Chambers to death, and Blakney to life imprisonment, for their first-degree murder convictions. In addition, each defendant was sentenced to two terms of forty years’ imprisonment for armed robbery and one term of forty years’ imprisonment for burglary. All sentences were to be served consecutively.
B.
Barnes appealed his conviction and sentence to the Supreme Court of North Carolina on various grounds. Relevant here is Barnes’ Sixth Amendment juror misconduct argument, which was based on two alleged occurrences: first, that a “juror called a minister to ask a question about the death penalty;” and second, “that a juror had taken a Bible into the jury room and read to the jury members from it before deliberations.” State v. Barnes, 345 N.C. 184, 481 S.E.2d 44, 66 (1997). Barnes argued that “the trial court erred in failing to conduct an investigation to determine what, if any, prejudice resulted from the alleged events.” Id. at 67. The Supreme Court of North Carolina disagreed, offering the following reasoning:
Assuming arguendo that defense counsel’s assertions were accurate, there still was no assertion that the juror’s reading from the Bible was accomplished in the context of any discussion about the case itself or that it involved extraneous influences as defined by this Court. The issue, therefore, is whether the trial court abused its discretion by failing to inquire further into the alleged Bible-reading incident when faced with the mere assertion that a juror read the Bible aloud in the jury room prior to the commencement of deliberations and pri- or to the trial court’s instructions to the jury. As there is no evidence that the alleged Bible reading was in any way directed to the facts or governing law at issue in the case, we cannot say that the trial court’s actions were an abuse of discretion.
With respect to a juror’s alleged actions in calling a clergy member, a similar analysis applies. The trial court was faced with the mere unsubstantiated allegation that a juror called a minister to *235 ask a question about the death penalty. Nothing in this assertion involved “extraneous information” as contemplated in [North Carolina Rule of Evidence] 606(b) or dealt with the fairness or impartiality of the juror. There is no evidence that the content of any such possible discussion prejudiced defendants or that the juror gained access to improper or prejudicial matters and considered them with regard to this case. We cannot say under the particular circumstances of this case that the trial court’s actions in failing to probe further into the sanctity of the jury room was an abuse of discretion. These assignments of error are therefore without merit.
Id. at 68.
The Supreme Court of North Carolina likewise rejected Barnes’ other contentions on direct appeal and affirmed his conviction and sentence on February 10, 1997. Barnes, 481 S.E.2d at 51, 82. On March 23, 1998, the Supreme Court of the United States denied Barnes’ petition for a writ of certiorari. See Barnes v. North Carolina, 523 U.S. 1024, 118 S.Ct. 1309, 140 L.Ed.2d 473 (1998).
C.
In February 1999, Barnes sought state post-conviction relief on various grounds, filing a Motion for Appropriate Relief (“MAR”) in Rowan County Superior Court (the “MAR Court”).[3] Barnes amended his MAR on January 24, 2001, and again on September 4, 2002.[4] With respect to his claim of juror misconduct, Barnes offered new information to the MAR Court to try to demonstrate that Hollie Jordan (“Juror Jordan”), a sitting juror, improperly communicated with her pastor about the death penalty during the sentencing phase of Barnes’ trial. This new information was presented through a number of exhibits compiled by post-conviction counsel and their investigator, which were based on post-verdict interviews with several of the jurors.[5]
One of the exhibits attached to Barnes’ MAR was an “Interview Summary” of a May 31, 1995 interview of Juror Jordan.[6] According to the Interview Summary, Juror Jordan was offended by the closing argument in which co-defendant Chambers’ attorney argued “that if jurors voted for the death penalty, they would one day face God’s judgment for killing these defendants.” J.A. 1898. Although Juror Jordan “did not accept the attorney’s argument,” she did notice “that another juror, a female, seemed visibly upset” by it. Id. “To remedy the effect of the argument, [Juror] Jordan brought a Bible from home into the jury deliberation room” and read a passage to all the jurors, which provided “that it is the duty of Christians to abide by the laws of the state.” Id. The Inter *236 view Summary does not mention any conversation with Juror Jordan’s pastor; it states that Juror Jordan knew the Bible passage from church.
In addition to Juror Jordan’s Interview Summary, Barnes’ MAR relied on a September 7, 2000 affidavit from Daniel C. Williams (“Investigator Williams”), an investigator hired by Barnes’ post-conviction counsel. In his affidavit, Investigator Williams described interviews he conducted with three jurors from Barnes’ trial, including Juror Jordan. According to Investigator Williams, Juror Jordan explained, “she called her pastor Tom Lo-max” (“Pastor Lomax”) in response to a defense attorney’s closing argument in which the attorney “suggested that if jurors returned a death sentence, they, the jurors[,] would one day face judgment for their actions.” J.A. 1892. Juror Jordan stated that she “discussed the lawyer’s argument with [Pastor] Lomax.” Id. During their conversation, “[Pastor] Lomax told [Juror] Jordan about another biblical passage which contradicted the passage relied upon by the defense attorney.” Id. The next day, Juror Jordan brought her Bible into the jury deliberation room and “read the passage suggested to her by [Pastor] Lomax to all of the jurors.” Id.
Investigator Williams also interviewed jurors Leah Weddington (“Juror Wedding-ton”) and Ardith F. Peacock (“Juror Peacock”), both of whom recalled that a member of the jury brought a Bible into the jury room during sentencing deliberations. Juror Weddington told Investigator Williams that “[t]he person who brought in the Bible read a passage to a juror who was having a hard time with the death penalty.” J.A. 1892-93. Juror Peacock could not recall the details of the verse, but she stated that it “dealt with life and death.” Id. at 1893. In a separate affidavit dated April 7, 2004, Juror Peacock stated that a defense attorney’s remarks that jurors would have to face God’s judgment if they imposed the death penalty “made the jury furious.” Id. at 1900. In response to this argument, one of the jurors read a passage from the Bible to the other jurors. Juror Peacock did not recall which juror brought the Bible or the exact verse that was read.
Investigator Williams also interviewed Pastor Lomax. Pastor Lomax confirmed that Juror Jordan attends his church. Moreover, although Pastor Lomax “could not recall the conversation recounted by [Juror] Jordan,” he “stated that it [was] possible that he did talk to her about the death penalty while she was a juror, but he simply does not remember it.” J.A. 1893.
Barnes’ MAR also attached an October 10, 2000 affidavit of Cynthia F. Adcock, an attorney with the North Carolina Resource Center, which recounted interviews with several jurors. According to Ms. Adcock, in a February 25, 1995 interview, Juror Weddington stated that “a juror named ‘Hollie’ brought a Bible into the jury room and read from it” and that “Hollie also talked to her pastor during the case.” J.A. 1902. Additionally, Ms. Adcock’s affidavit explains that in a separate February 25, 1995 interview, Juror Wanda Allen (“Juror Allen”) “recalled discussions about the fact that one of the jurors had brought in a [B]ible and had talked with her pastor.” Id.
Relying on this new information, Barnes contended that there was juror misconduct during the sentencing phase of his trial. On March 19, 2007, the MAR Court held an evidentiary hearing on some, but not all, of the claims raised in Barnes’ MAR. Importantly, the MAR Court did not conduct an evidentiary hearing on Barnes’ juror misconduct claim.
Instead, the MAR Court “summarily denied” the juror misconduct claim, holding *237 that it was “procedurally barred and without merit” under N.C. Gen.Stat. § 15A-1419(a)(2) because the issue had previously been addressed and rejected by the Supreme Court of North Carolina on direct appeal.[7] J.A. 1882-83. The MAR Court further concluded that Barnes’ “argument that there is now additional evidence which was not available at that time is without foundation or support, and [Barnes] seeks to present anew the same contentions and inferences raised in his initial appeal.” Id. at 1883. The court explained, “[t]he allegedly new evidence adds nothing to the issue as it was presented during [Barnes’] original appeal, and the allegations are subject to the same analysis inherent in [the Supreme Court of North Carolina’s] decision.” Id. Consequently, the MAR Court entered an order on May 31, 2007, denying all claims raised in Barnes’ MAR. On March 6, 2008, the Supreme Court of North Carolina denied Barnes’ request for certiorari review. See State v. Barnes, 362 N.C. 239, 660 S.E.2d 53 (2008).
D.
On April 17, 2008, Barnes filed a Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Middle District of North Carolina. Just as he did in his MAR, Barnes raised a number of challenges to his conviction and sentence, including juror misconduct during his sentencing. On February 3, 2012, a United States Magistrate Judge issued a report and recommendation, recommending that all claims in the petition be denied. Barnes v. Branker, 1:08-CV-271, 2012 WL 373353, at *39 (M.D.N.C. Feb. 3, 2012). On March 28, 2013, after concluding that the issues raised by Barnes did not require a hearing, the district court adopted the magistrate judge’s recommendation and issued an opinion and order denying Barnes’ habeas petition. See Barnes v. Lassiter, 1:08-CV-00271, 2013 WL 1314466, at *6-7, *20 (M.D.N.C. Mar. 28, 2013). The district court, however, granted a certificate of appealability (“COA”), pursuant to 28 U.S.C. § 2253(c)(2), on the issue of whether a juror’s contact with her pastor violated Barnes’ Sixth Amendment right to a fair trial. Id. at *20. Barnes timely appealed.[8] We possess jurisdiction pursuant to 28 U.S.C. § 2253.
II.
A.
“We review de novo the district court’s application of the standards of 28 *238 U.S.C. § 2254(d) to the findings and conclusions of the MAR court.” McNeill v. Polk, 476 F.3d 206, 210 (4th Cir.2007). In conducting our habeas review, we are restricted to the question of whether a state prisoner “is in custody in violation of the Constitution or laws or treaties of the United States.” 28 U.S.C. § 2254(a); see also Estelle v. McGuire, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Moreover, because we are engaging in collateral review of a state court adjudication, our authority to grant relief is constrained by the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”). See DeCastro v. Branker, 642 F.3d 442, 449 (4th Cir.2011) (citing 28 U.S.C. § 2254(d)). Under AEDPA, we may grant habeas relief on a claim that has been previously adjudicated “on the merits”[9] in state court only if that adjudication “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1).[10]
A state court’s decision is “contrary to” clearly established federal law “if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law,” or if it reaches a different result than the Supreme Court previously reached on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Further, a state court’s decision is an “unreasonable application” of clearly established federal law when the state court “identifies the correct governing legal principle from [the Supreme] Court’s decisions but unreasonably applies that principle to the facts of the prisoner’s case.” Id. at 413, 120 S.Ct. 1495. This means that to obtain relief, “a state prisoner must show that the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” White v. Woodall, — U.S. -, 134 S.Ct. 1697, 1699, 188 L.Ed.2d 698 (2014) (internal quotation marks omitted).
 Under the unreasonable application clause of § 2254(d)(1), we look to whether the state court’s application of law was “objectively unreasonable” and not simply whether the state court applied the *239 law incorrectly. Robinson v. Polk, 438 F.3d 350, 355 (4th Cir.2006); see also Williams, 529 U.S. at 411, 120 S.Ct. 1495 (explaining that “a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly”). The phrase “clearly established Federal law” means “the holdings, as opposed to the dicta, of [the Supreme] Court’s decisions as of the time of the relevant state-court decision.” Williams, 529 U.S. at 412, 120 S.Ct. 1495.
B.
Even if we conclude that the state court’s adjudication was contrary to, or an unreasonable application of, clearly established federal law, our inquiry is not over. As we have observed, “ ‘most constitutional errors can be harmless.’ ” Bauberger v. Haynes, 632 F.3d 100, 104 (4th Cir.2011) (quoting Arizona v. Fulminante, 499 U.S. 279, 306, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). Therefore, “we are not permitted to grant habeas relief unless we are convinced that the error had a ‘substantial and injurious effect or influence in determining the jury’s verdict.’” Fullwood v. Lee, 290 F.3d 663, 679 (4th Cir.2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). This means that before a federal court grants habeas relief, it must conclude that the state court’s constitutional error “actually prejudiced” the habeas petitioner. Bauberger, 632 F.3d at 104 (“Because of the threat collateral attacks pose to ‘finality, comity, and federalism,’ habeas petitioners may secure the writ only if the error ‘actually] prejudice^]’ them.” (internal citations omitted and alterations in original)). It is under this framework that we examine Barnes’ claim of juror misconduct.
III.
Barnes argues that under the Sixth and Fourteenth Amendments to the United States Constitution, he was deprived of his right to an impartial jury at his capital sentencing because at least one juror improperly communicated with her pastor and relayed the information obtained from her pastor to the rest of the jury. As a result, Barnes contends that the jury considered extraneous information that the parties did not introduce at trial. Relying on the Supreme Court’s decision in Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), Barnes contends that the MAR Court unreasonably applied clearly established federal law by failing to attach a presumption of prejudice upon his showing of an extraneous influence on the jury (the “Remmer presumption”). In a related, but distinct argument, Barnes also contends that the MAR Court unreasonably applied clearly established federal law by failing to order the state trial court to hold a hearing on juror misconduct, during which Barnes would be entitled to the Remmer presumption, or, at a minimum, during which he would have the opportunity to prove the prejudicial impact of the extraneous influence.
The State counters by first arguing that there is no clearly established federal law applicable to the situation presented in the instant case. Thus, according to the State, the MAR Court’s adjudication of Barnes’ juror misconduct claim necessarily could not have been contrary to, or an unreasonable application of, clearly established federal law. The State next argues that even if there is clearly established federal law applicable here, the MAR Court did not unreasonably apply such law because the communication between the juror and her pastor was not “about the matter pending *240 before the jury.” See Remmer, 347 U.S. at 229, 74 S.Ct. 450 (emphasis supplied). According to the State, this means Barnes was entitled to neither the Remmer presumption, nor to a hearing on the issue of juror misconduct. Finally, the State contends that the district court correctly applied the AEDPA standard — which requires proof of a “substantial and injurious effect” on Barnes’ sentencing in order to grant habeas relief — and that, therefore, an evidentiary hearing in the district court was not required.
In light of our review under AEDPA, as well as the parties’ arguments summarized above, we must address the following three issues: (1) whether there was clearly established federal law governing Barnes’ juror misconduct claim at the time of the MAR Court’s adjudication; (2) if so, whether the MAR Court acted contrary to this clearly established law, or applied it unreasonably, in failing to order a hearing or apply a presumption of prejudice after Barnes presented allegations that a juror communicated with her pastor about the death penalty during Barnes’ sentencing; and (3) whether this error had a substantial and injurious effect on Barnes’ sentencing. See Hall v. Zenk, 692 F.3d 793, 799 (7th Cir.2012) (employing this three-step analysis on federal habeas review).
A.
Clearly Established Federal Law
The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to a trial by an impartial jury. See U.S. Const, amend. VI; Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (“In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process.” (internal quotation marks omitted)); Turner v. Louisiana, 379 U.S. 466, 471-73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). An impartial jury is one that arrives at its verdict “based upon the evidence developed at trial” and without external influences. Irvin, 366 U.S. at 722, 81 S.Ct. 1639; see also Remmer, 347 U.S. at 229, 74 S.Ct. 450. “No right touches more the heart of fairness in a trial,” Stockton v. Virginia, 852 F.2d 740, 743 (4th Cir.1988), and this right applies equally to sentencing proceedings that are tried to a jury, Robinson v. Polk, 438 F.3d 350, 359 (4th Cir.2006) (citing Morgan v. Illinois, 504 U.S. 719, 727-28, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)).
It is clearly established under Supreme Court precedent that an external influence affecting a jury’s deliberations violates a criminal defendant’s right to an impartial jury. See, e.g., Parker v. Gladden, 385 U.S. 363, 364-66, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (per curiam); Turner, 379 U.S. at 472-73, 85 S.Ct. 546; Remmer, 347 U.S. at 229, 74 S.Ct. 450. Especially troubling are private communications between a juror and a third party. See Fullwood v. Lee, 290 F.3d 663, 677 (4th Cir.2002) (“The Supreme Court has clearly stated that private communications between an outside party and a juror raise Sixth Amendment concerns.” (citing Parker, 385 U.S. at 364, 87 S.Ct. 468)). Indeed, it is well established that “ ‘private talk, tending to reach the jury by outside influence’ is constitutionally suspect.” Id. (quoting Parker, 385 U.S. at 364, 87 S.Ct. 468). The Supreme Court recognized this as early as 1892 when it declared that “[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear.” Mattox v. United *241 States, 146 U.S. 140, 150, 13 S.Ct. 50, 36 L.Ed. 917 (1892).
1.
In light of these significant constitutional concerns, the Supreme Court in Remmer created a rebuttable presumption of prejudice applying to communications or contact between a third party and a juror concerning the matter pending before the jury. Remmer, 347 U.S. at 229, 74 S.Ct. 450; see also Fullwood, 290 F.3d at 678 (explaining that the Supreme Court adopted the Remmer presumption “[b]e-cause the potential for mischief is so great when a third party establishes private, extrajudicial contact with a juror”).
In Remmer, a juror reported to the district judge that an unnamed third party suggested to the juror that he could profit by returning a defense verdict. 347 U.S. at 228, 74 S.Ct. 450. The judge assigned an FBI agent to investigate the incident, and the agent reported to the judge “that the statement to the juror was made in jest.” Id. The agent’s report was reviewed by the judge and the prosecutor but was not disclosed to defense counsel. Id. After trial, the defendant became aware of the incident and filed a motion for a new trial in which he requested a hearing “to determine the circumstances surrounding the incident and its effect on the jury.” Id. Without holding the requested hearing, the district court denied the motion. Id. at 229, 74 S.Ct. 450. The Ninth Circuit affirmed, holding that the district court did not abuse its discretion in denying the motion for a new trial because the defendant failed to show prejudice. See Remmer v. United States, 205 F.2d 277, 291 (9th Cir.1953), vacated, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).
The defendant appealed to the Supreme Court, which vacated the Ninth Circuit’s judgment and remanded the case for a hearing. Remmer, 347 U.S. at 229-30, 74 S.Ct. 450. Specifically, the Court stated, “any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial.” Id. (emphasis supplied). “The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.” Id. (emphasis supplied) (citing Mattox, 146 U.S. at 148-50, 13 S.Ct. 50).[11] No such hearing was conducted by the district court in Remmer. As a result, the Supreme Court “[did] not know from this record, nor [did] the petitioner know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless.” Id. at 229, 74 S.Ct. 450.
The Court further noted that when allegations of juror partiality come to light, “[t]he trial court should not decide and take final action ex parte on information such as was received in this case.” Remmer, 347 U.S. at 229-30, 74 S.Ct. 450. *242 Instead, the trial court “should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.” Id. at 230, 74 S.Ct. 450. The Supreme Court remanded the case to the district court with instructions that it hold a hearing to determine whether the incident was harmful to the defendant. Id. The case eventually made its way back up to the Supreme Court, at which time the Court explained that “[i]t was the paucity of information relating to the entire situation coupled with the presumption which attaches to the kind of facts alleged by petitioner which, in [the Court’s] view, made manifest the need for a full hearing.” Remmer v. United States (“Remmer II”), 350 U.S. 377, 379-80, 76 S.Ct. 425, 100 L.Ed. 435 (1956).
Thus, Remmer clearly established not only a presumption of prejudice, but also a defendant’s entitlement to an evidentiary hearing, when the defendant presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury. We proceed to discuss each of these aspects of Remmer in turn.
a.
With respect to the presumption of prejudice, we have recently observed, “there is a split among the circuits regarding whether the Remmer presumption has survived intact following” the Supreme Court’s decisions in Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), and United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). United States v. Lawson, 677 F.3d 629, 642 (4th Cir.2012); see also id. at 643-44 (describing the circuit split). A brief discussion of Phillips, Olano, and our subsequent case law is instructive.
Phillips was a habeas corpus appeal in which a sitting juror applied to the state district attorney’s office for a position as an investigator during the pendency of a state court trial. 455 U.S. at 212, 102 S.Ct. 940. The defendant learned of the juror’s employment application after the jury found him guilty. As a result, the defendant moved to set aside the verdict. Id. at 213, 102 S.Ct. 940. After conducting a hearing in which the trial court received testimony from the juror and the prosecutor, the trial court denied the defendant’s motion, finding that the juror was not biased as a result of his employment application. Id. at 213-14, 102 S.Ct. 940. The Supreme Court concluded that the hearing was sufficient, holding that due process requires the trial court to conduct a hearing during which “the defendant has the opportunity to prove actual bias.” Id. at 215, 102 S.Ct. 940 (emphasis supplied). Although the Court spoke in terms of the defendant proving bias rather than the government rebutting a presumption of prejudice, we have nonetheless expressly held that Phillips did not overturn the Remmer presumption. See Stockton, 852 F.2d at 744 (distinguishing Phillips and concluding that in cases where “the danger is not one of juror impairment or predisposition, but rather the effect of an extraneous communication upon the deliberative process of the jury,” the Remmer presumption applies (emphasis supplied)).
Olano was a direct appeal in which a district court permitted alternate jurors to be present during jury deliberations in violation of Federal Rule of Criminal Procedure 24(c). 507 U.S. at 729-30, 113 S.Ct. 1770. Because the defendants did not object to the alternate jurors’ presence, the Supreme Court considered whether the district court’s decision was plain error under Federal Rule of Criminal Procedure 52(b). Id. at 730, 737, 113 S.Ct. 1770. The Supreme Court cited Remmer and ob *243 served, “[tjhere may be cases where an intrusion should be presumed prejudicial, but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury’s deliberations and thereby its verdict?” Id. at 739, 113 S.Ct. 1770 (internal citations omitted). We have recently “eonclude[d] that the Supreme Court’s discussion, of the ‘ultimate inquiry’ to be performed in cases involving ‘intrusions’ into a jury’s deliberations, suggests that this inquiry may be framed either as a rebuttable presumption or as a specific analysis of the intrusion’s effect on the verdict.” Lawson, 677 F.3d at 642 (emphasis supplied). Nonetheless, we have applied the Remmer presumption post-Olano, both on direct appeal and on § 2254 review. See id. (noting, on direct appeal, that “the Remmer rebuttable presumption remains live and well in the Fourth Circuit”); United States v. Blauvelt, 638 F.3d 281, 294-95 (4th Cir.2011) (direct appeal); Wolfe v. Johnson, 565 F.3d 140, 160-62 (4th Cir.2009) (28 U.S.C. § 2254 review); Fullwood, 290 F.3d at 677-78 (28 U.S.C. § 2254 review). Wolfe and Fullwood were post-AEDPA cases. Therefore, the Remmer presumption must have been clearly established in order to be relevant under AEDPA. See 28 U.S.C. § 2254(d).
Thus, by necessary implication, we have held that the Remmer presumption is clearly established federal law as defined by AEDPA even after the Supreme Court’s decisions in Phillips and Olano. The State has not asked us to reconsider our position, and we will therefore continue to deem the Remmer presumption “clearly established federal law” here. See Marshall v. Rodgers, — U.S. -, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013) (per curiam) (explaining that “an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent”).
b.
We also recognize that Remmer established a separate, but related requirement that a defendant be entitled to a hearing when the defendant presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury. See Haley v. Blue Ridge Transfer Co., 802 F.2d 1532, 1535 (4th Cir.1986) (describing the Remmer presumption and explaining that “Remmer also established the requirement of a post-trial evidentiary hearing in which the prevailing party has the opportunity and burden of rebutting the presumption of juror prejudice”); see also United States v. Malloy, 758 F.2d 979, 982 (4th Cir.1985) (referring to the post-trial evidentiary hearing concerning potential juror bias as a “required” hearing); Stouffer v. Trammell, 738 F.3d 1205, 1214 (10th Cir.2013) (explaining that “[t]he trial court’s duty to conduct a Remmer hearing when genuine concerns of improper juror contact arise is clearly established by the Supreme Court”).[12]
Post -Remmer Supreme Court case law has confirmed that due process requires a hearing to alleviate concerns of juror partiality. In Phillips, the Court explained that it “has long held that the remedy for allegations of juror partiality is a hearing *244 in which the defendant has the opportunity to prove actual bias.” 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); see also Porter v. Illinois, 479 U.S. 898, 900, 107 S.Ct. 298, 93 L.Ed.2d 272 (1986) (Marshall, J., dissenting from denial of writ of certiorari) (citing Remmer and Phillips and explaining that “[w]hen a substantial question of juror bias is presented to the trial court, ... we have held that the defendant is entitled to a hearing with all interested parties permitted to participate” (internal quotation marks omitted)).
The requirement that a trial court conduct a hearing to determine juror partiality is rooted in the Constitution:
Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in Remmer and held in this case.
Phillips, 455 U.S. at 217, 102 S.Ct. 940. Depending on when allegations of improper juror communication or contact are brought to the trial court’s attention, the hearing requirement may be satisfied post-trial, like in Remmer, or during trial. See Ladd v. South Carolina, 415 F.2d 870, 873 (4th Cir.1969) (explaining that by conducting an “adversary proceeding ... in open court during the state trial,” the trial judge did “precisely that taught by Remmer”). Accordingly, it is clearly established federal law for purposes of our review under AEDPA that a defendant is entitled to a hearing when he or she presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury.[13]
2.
Of course, not every allegation of an unauthorized communication between a juror and a third party will trigger the Remmer presumption and its corresponding hearing requirement. See Haley, 802 F.2d at 1537 n. 9 (recognizing that “certain kinds of extrajudicial contacts may amount to nothing more than innocuous interventions that simply could not justify a presumption of prejudicial effect”). To be sure, “due process does not require a new trial every time a juror has been placed in a potentially compromising situation,” Phillips, 455 U.S. at 217, 102 S.Ct. 940, and the Remmer presumption “is not one to be casually invoked,” Stockton, 852 F.2d at 745. Therefore, to be entitled to the Remmer presumption and a Remmer hearing, a “defendant must first establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict.” Id. at 743; Billings v. Polk, 441 F.3d 238, 247 n. 6 (4th Cir.2006); see also Stouffer, 738 F.3d at 1214 (“When a trial court is apprised of the fact that an extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the eireum *245 stances of the improper contact and the extent of the prejudice, if any, to the defendant.”); Wisehart v. Davis, 408 F.3d 321, 326 (7th Cir.2005) (a Remmer hearing is required when “the extraneous communication to the juror [is] of a character that creates a reasonable suspicion that further inquiry is necessary to determine whether the defendant was deprived of his right to an impartial jury”).
Stated differently, the Remmer presumption and hearing requirement are triggered after the party attacking the verdict satisfies the “minimal standard” of showing that “extrajudicial communications or contacts [between a juror and a third party] were more than innocuous interventions.” United States v. Cheek, 94 F.3d 136, 141 (4th Cir.1996) (internal citations and quotation marks omitted). In considering whether a particular communication or contact between a juror and a third party is more than an innocuous intervention, we refer back to the “factors the Supreme Court deemed important” in Remmer itself. Id. Those factors are: any private communication; any private contact; any tampering; directly or indirectly with a juror during trial; about the matter before the jury. See id. (citing Remmer, 347 U.S. at 229, 74 S.Ct. 450).
Extrajudicial communications or contact with a juror has been deemed to trigger Remmer in a variety of circumstances, including: a juror being offered a bribe during trial and subsequently being investigated by an FBI agent, Remmer, 347 U.S. at 229-30, 74 S.Ct. 450; a juror applying for a job at the prosecuting attorney’s office during the trial, Phillips, 455 U.S. at 216-18, 102 S.Ct. 940; a local restaurant owner suggesting to jurors in a capital case that “they ought to fry the son of a bitch,” Stockton, 852 F.2d at 743; and allegations, if proven to be true during an evidentiary hearing, that a juror’s husband pressured her throughout the trial to vote for the death penalty, Fullwood, 290 F.3d at 681-82. See also Parker, 385 U.S. at 363-64, 87 S.Ct. 468 (finding habeas petitioner was deprived of his right to an impartial jury where the bailiff said, in the presence of certain jurors, that petitioner was a “wicked fellow” and that he was guilty, and later said to another juror, “[i]f there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it” (alteration in original)); Turner, 379 U.S. at 467-69, 474, 85 S.Ct. 546 (finding state defendant was denied the right to a trial by an impartial jury where two deputy sheriffs, who served as key prosecution witnesses, were responsible for the sequestration of the jury during which time they “ate with [the jury], conversed with them, and did errands for them,” even where there was no evidence that the deputies discussed the case with the jurors).
Importantly, each of the illustrations above dealt with external influences on jury deliberations. See Wolfe, 565 F.3d at 161 (“In its jury influence jurisprudence, the [Supreme] Court has clearly distinguished between external jury influences, on the one hand, and internal jury influences, on the other.” (emphasis in original)). As we have recognized, “[u]nder clearly established Supreme Court case law,” an influence on a jury’s deliberative process is external if it is either “extraneous prejudicial information; i.e., information that was not admitted into evidence but nevertheless bears on a fact at issue in the case,” or if it is “an outside influence upon the partiality of the jury, such as private communication, contact, or tampering ... with a juror.” Robinson, 438 F.3d at 363 (internal citations and quotation marks omitted). The distinction between internal and external *246 jury influences is critical because, unlike external influences, which “necessitate a thorough judicial inquiry, no such obligation is imposed with regard to an internal jury influence.” Wolfe, 565 F.3d at 161 (emphasis supplied); see also Robinson (explaining that Tanner v. United States, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) “establishes that the Sixth Amendment’s guarantees do not require judicial consideration of juror allegations regarding influences internal to the deliberation process”).
3.
In the face of this clearly established Supreme Court precedent available to guide a state court’s adjudication of a claim of external influences on a jury’s deliberations, the State nonetheless asserts that because the Supreme Court’s decisions evaluating external influences on a jury’s deliberations involved different factual circumstances than those presented by Barnes, the Supreme Court “has given state courts little to no guidance” in adjudicating such claims. Appellee Br. 21-22. It is, therefore, the State’s position that the MAR Court’s adjudication in this case could not have been an unreasonable application of clearly established federal law. The State is incorrect.
Indeed, Remmer and its progeny clearly established that a presumption of prejudice must be applied, and that a hearing must be held, when a defendant presents a genuine allegation of communication or contact between a third party and a juror concerning the matter pending before the jury. There is no requirement under AEDPA that a habeas petitioner present facts identical to those previously considered by the Supreme Court to be entitled to relief. Panetti v. Quarterman, 551 U.S. 930, 953, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (noting that “AEDPA does not ‘require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied’ ” (quoting Carey v. Musladin, 549 U.S. 70, 81, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (Kennedy, J., concurring in judgment))); see also Williams v. Taylor, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (a state court’s decision is an “unreasonable application” of clearly established federal law if the court “identifies the correct governing legal rule from [the Supreme] Court’s cases but unreasonably applies it to the facts of the particular state prisoner’s case” (emphasis supplied)). Thus, as illustrated, this clearly established legal principle can apply to myriad factual circumstances involving third party communications with jurors.
Our § 2254 review of Barnes’ juror misconduct claim is therefore guided by Remmer and the other clearly established Supreme Court precedent described above concerning third party communications with jurors.
B.
Unreasonable Application of Clearly Established Federal Law
Having identified the clearly established federal law governing Barnes’ juror misconduct claim, we must now determine whether the MAR Court acted contrary to this clearly established law, or applied it unreasonably, in failing to order a hearing and failing to apply a presumption of prejudice after Barnes presented allegations that a juror communicated with her pastor about the death penalty during Barnes’ capital sentencing. In view of the evidence presented to the MAR Court, we conclude that its adjudication of Barnes’ juror misconduct claim amounted to an unreasonable application of clearly established federal law.
*247 l.
Immediately after the jury recommended that Barnes be sentenced to death, the trial court was alerted to the fact that one of the jurors “called a member of the clergy, perhaps a relative of hers, to ask about a particular question as to the death penalty.” J.A. 1602. In response to the trial judge’s inquiry regarding whether the juror “discussed the particular facts of this case with anybody outside the jury,” defense counsel stated that there was “[n]o evidence that they did or did not as far as the conversation with the minister is concerned.” Id. Because defense counsel could not point to any such evidence at that time, the trial court “den[ied] the request to start questioning [the] jury about what may or may not have taken place during their deliberations of this trial.” Id. at 1602-03.
Barnes provided additional details concerning the juror’s communication with her pastor to the MAR Court. In his MAR, Barnes presented allegations that one or more jurors were bothered by a closing argument made during Barnes’ capital sentencing hearing. The closing argument in question was made by a co-defendant’s attorney, in which he suggested that if the jury returned a sentence of death, the jurors would one day face God’s judgment for their actions. According to Juror Peacock, the closing argument “made the jury furious.” J.A. 1900. Moreover, Juror Jordan noticed “that another juror, a female, seemed visibly upset by the argument.” Id. at 1898. In response, Juror Jordan contacted her pastor, Pastor Lomax, and “discussed the lawyer’s argument” with him. Id. at 1892. During their conversation, Pastor Lomax “told [Juror] Jordan about another biblical passage which contradicted the passage relied upon by the defense attorney.” Id. Two other jurors remembered that a juror talked to her pastor during the case. In particular, Juror Weddington stated that “a juror named ‘Hollie’ brought a Bible into the jury room and read from it” and that “Hollie also talked to her pastor during the case.” Id. at 1902. Additionally, Juror Allen “recalled discussions about the fact that one of the jurors had brought in a [B]ible and had talked with her pastor.” Id.[14]
Barnes presented further evidence to the MAR Court that Juror Jordan brought her Bible into the jury deliberation room and “read the passage suggested to her by [Pastor] Lomax to all of the jurors.” J.A. 1892. Although Juror Jordan recalled that the passage stated “that it [was] the duty of Christians to abide by the laws of the state,” id. at 1898, Juror Peacock stated that the passage “dealt with life and death,” id. at 1893. In addition, Juror Weddington observed, “[t]he person who brought in the Bible read a passage to a juror who was having a hard time with the death penalty.” Id. at 1892-93.
2.
After being presented with the allegations described above, the MAR Court failed to apply Remmer or any reasonable version of it. As we have explained, Remmer imposes not only a presumption of prejudice, but also entitles the defendant to an evidentiary hearing when the defendant presents allegations of an extraneous influence on the jury — that is, communications or contact between a third party and a juror concerning the matter pending before the jury. Remmer, 347 U.S. at 229- *248 30, 74 S.Ct. 450; Haley, 802 F.2d at 1535. Here, it is without question that Juror Jordan’s conversation with Pastor Lomax was a contact or communication with a third party. We must therefore determine whether this contact concerned the matter pending before the jury.
An unauthorized contact between a third party and a juror concerns the matter pending before the jury when it is “of such a character as to reasonably draw into question the integrity of the verdict.” Stockton, 852 F.2d at 743.[15] This is a “minimal standard.” Cheek, 94 F.3d at 141. Indeed, all that is required is a threshold showing that “the extrajudicial communications or contacts were more than innocuous interventions.” Id. (internal quotation marks omitted).
The MAR Court greatly distorted Barnes’ burden, requiring much more of Barnes than a threshold or minimal showing of potential juror bias. Instead, to demonstrate an entitlement to a hearing, the MAR Court required Barnes to present evidence that a juror was actually biased and that Barnes was therefore actually prejudiced by the unauthorized communication. After concluding that Barnes’ new evidence “adds nothing to the issue as it was presented during [his] original appeal,” J.A. 1883, the MAR Court incorporated the North Carolina Supreme Court’s reasoning from the direct appeal, which denied Barnes’ request for a hearing because “[t]here is no evidence that the content of any such possible discussion prejudiced [Barnes],” State v. Barnes, 345 N.C. 184, 481 S.E.2d 44, 68 (1997) (emphasis supplied). Even though Barnes alleged that Juror Jordan called Pastor Lomax and discussed the death penalty with him while Juror Jordan was considering whether Barnes and his co-defendants would live or die, the court did not consider this conversation as involving “ ‘extraneous information’ ... or dealing] with the fairness and impartiality of the juror.” Id. In essence, the MAR Court demanded proof of a Sixth Amendment violation — that is, proof of juror bias — before Barnes was entitled to any relief. Such a requirement is directly at odds with Remmer. Certainly, if defendants were required to prove juror bias before obtaining a hearing, the Remmer hearing requirement, which is designed to determine “what actually transpired, or whether the incidents that may have occurred were harmful or harmless,” Remmer, 347 U.S. at 229, 74 S.Ct. 450, would be utterly meaningless. Therefore, no reasonable reading of Remmer comports with the burden placed on Barnes by the MAR Court.
The district court’s conclusion that Juror Jordon’s conversation with Pastor Lomax did not reasonably draw into question the integrity of the verdict is similarly flawed. In the district court’s view, Barnes’ allegations simply demonstrated that Pastor Lo-max directed Juror Jordan “to a portion of the Bible in response to a defense argument that was most assuredly not before the jury — i.e., whether God would condemn a juror who voted to impose a death sentence.” Barnes v. Lassiter, 1:08-CV-00271, 2013 WL 1314466, at *6 (M.D.N.C. Mar. 28, 2013) (emphasis in original). We cannot agree. During the sentencing phase of Barnes’ trial, the jury was *249 charged with deciding whether to impose a sentence of life imprisonment or a sentence of death for Barnes and his co-defendants. Clearly, then, “the matter before the jury” was the appropriateness of the death penalty for these defendants. To the extent that a juror had a conversation with a third party about the spiritual or moral implications of making this decision, the communication “was of such a character as to reasonably draw into question the integrity of the verdict,” Stockton, 852 F.2d at 743, and further inquiry in a Remmer hearing was required.
Our dissenting colleague characterizes this analysis as “conclud[ing] that the communication alleged here satisfies Remmer because ‘the spiritual or moral implications of deciding whether to impose death ‘clearly’ related to ‘the matter pending before the jury.’ ” Post at 260. The dissenting opinion misconstrues the point. Given a jury’s role during the sentencing phase of a capital case, “the matter pending before the jury” is to determine whether or not the defendant ought to receive the death penalty. See Caldwell v. Mississippi 472 U.S. 320, 329, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (describing the duty of “capital sentencers” as “the serious one of determining whether a specific human being should die at the hands of the State”); Stockton, 852 F.2d at 746 (28 U.S.C. § 2254 case analyzing Remmer and noting that “the exact issue” for jurors in the sentencing phase of a capital case to decide is “whether to impose the death penalty”). Here, as the dissent acknowledges, during the sentencing phase, the jury was presented with an argument from defense counsel “suggesting] that if jurors returned a death sentence, they, the jurors would one day face judgment for their actions.” J.A. 1892 (emphasis supplied). This argument was directly aimed at whether the jury should impose the death penalty, and at no point did the trial court instruct the jury to disregard the argument. The argument was thus squarely presented for the jury’s consideration as part of their ultimate sentencing decision.
After hearing the argument, Juror Jordan contacted her pastor and “discussed the lawyer’s argument” with him. J.A. 1892. During their conversation, the pastor “told [Juror] Jordan about another biblical passage which contradicted the passage relied upon by the defense attorney.” Id. We need look no further than these allegations to conclude that Juror Jordan’s conversation with a third party about defense counsel’s argument, which asked the jury to return a sentence of life imprisonment instead of death, bore on the jury’s sentencing determination and was, therefore, “about the matter pending before the jury.” To conclude otherwise would not simply be incorrect or erroneous; it would be objectively unreasonable.[16]
*250 Moreover, in discussing whether relief under Remmer was warranted in this case, the dissent focuses not on what is alleged by Barnes, but rather on what is missing from his allegations. In this regard, the dissent states, “[n]owhere in the affidavits supporting his claim does Barnes suggest that the pastor expressed his views of the death penalty either generally or as applied to this case.” Post at 261. The dissent continues, noting that Barnes’ affidavits do not “support the claim that the pastor attempted to persuade the juror to vote for or against the death penalty, suggested that the Bible supported a particular sentence in this case, or exposed the juror to any extraneous information relevant to the juror’s deliberative process.” Id. In making these observations, the dissent ignores a critical component underlying the Supreme Court’s concern in cases involving juror bias — that without a hearing, a criminal defendant is deprived of the opportunity to uncover facts that could prove a Sixth Amendment violation. See Remmer, 347 U.S. at 229, 74 S.Ct. 450 (“We do not know from this record, nor does the petitioner know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless.”); Remmer II, 350 U.S. at 379-80, 76 S.Ct. 425 (“It was the paucity of information relating to the entire situation coupled with the presumption which attaches to the kind of facts alleged by petitioner which, in our view, made manifest the need for a full hearing.”); Smith, 455 U.S. at 215, 102 S.Ct. 940 (“This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.”).
The Supreme Court has cautioned, “[t]he integrity of jury proceedings must not be jeopardized by unauthorized invasions.” Remmer, 347 U.S. at 229, 74 S.Ct. 450. Here, Barnes has sufficiently alleged a third party communication with a juror that may well have jeopardized the integrity of the sentencing phase of his trial. The absence of evidence highlighted by the dissent, coupled with the nature of Barnes’ allegations, is precisely why Remmer requires the state courts to hold a hearing in such cases.
The district court concluded, however, that a hearing in state court was not necessary because the “North Carolina courts accepted ... Barnes’ claims as true when they assessed whether he had raised a constitutional claim warranting relief and determined that he had not.” Barnes, 2013 WL 1314466, at *6. But, when a court is presented with credible allegations of juror communications with a third party about the matter pending before the jury, Remmer requires a hearing. This requirement cannot be circumvented by simply accepting the factual allegations as true. Just as in Remmer, the MAR Court here, faced with a credible claim of juror misconduct, “[did] not know from this record, nor [did] [Barnes] know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless.” Remmer, 347 U.S. at 229, 74 S.Ct. 450. Accordingly, the district court incorrectly concluded that although there was unauthorized contact between a juror and her pastor, Barnes was not entitled to the Remmer presumption of prejudice or a Remmer hearing.
*251 Barnes’ allegations raised a genuine concern of juror impartiality, and due process therefore required the MAR Court to remedy this allegation by ordering a hearing in which Barnes would have enjoyed a presumption of prejudice. See Phillips, 455 U.S. at 215, 102 S.Ct. 940; Haley, 802 F.2d at 1535. By demanding that Barnes prove prejudice before affording him a hearing, the MAR Court turned Remmer on its head. The MAR Court’s adjudication was an objectively unreasonable application of clearly established federal law to the facts of Barnes’ juror misconduct claim, see Williams, 529 U.S. at 407, 120 S.Ct. 1495, and its failure to investigate Barnes’ juror misconduct claim was thus an abuse of discretion.
3.
The State nevertheless argues that the MAR Court did not unreasonably apply clearly established federal law because our court has previously determined, on § 2254 review, that it was not unreasonable for a state court to conclude that the presence of a Bible in the jury room was not an extraneous prejudicial influence on a jury’s verdict. Our “Bible in the jury room” line of cases, however, is readily distinguishable. In Robinson, for example, a juror asked the bailiff for a Bible and subsequently read several passages out loud in the jury room — including at least one referring to “an eye for an eye” — to convince the other jurors to vote for a death sentence. 438 F.3d at 357-58. With respect to the Remmer issue, we held, “it would have been reasonable for the MAR court to conclude that the Bible is not analogous to a private communication, contact, or tampering with a juror.” Id. at 363. Unlike a private communication with a third party, “which impose[s] pressure upon a juror apart from the juror himself, the reading of Bible passages invites the listener to examine his or her own conscience from within.” Id. Therefore, we concluded that the Bible, standing alone, was not an “external influence,” as that term was used in the Remmer line of cases. Id. at 363-64. Of particular relevance here, we further explained:
The fact that the bailiff provided the Bible to the juror does not alter our conclusion that it was not an external influence. Robinson does not allege that the bailiff instructed the jury to consult the Bible, or, for that matter, that he did anything other than simply provide the Bible upon the juror’s request. On these facts, the MAR court reasonably could have concluded that the bailiffs act of providing a Bible was nothing more than an innocuous intervention into the jury’s deliberations.
Id. at 366.
Despite the State’s arguments to the contrary, the only similarity between the instant case and the “Bible in the jury room” line of cases is the Bible itself. Unlike in Robinson, where the juror in question was simply given a Bible and read from it in the jury room, Barnes has alleged that Juror Jordan was actually directed to a specific biblical passage by her pastor in response to an argument about the death penalty and that other jurors were aware that Juror Jordan had consulted her pastor in this regard. We alluded that Robinson might have been a different case if the bailiff had “instructed the jury to consult the Bible” or done “anything other than simply provide the Bible upon the juror’s request.” 438 F.3d at 366. Barnes has presented that case — -his allegations clearly indicate that Pastor Lomax did not simply provide Juror Jordan with a Bible. In sum, because Robinson did not involve any extraneous communication or contact between a juror and a third party, it does not change our conclusion that the MAR Court unreasonably applied clearly *252 established federal law by simply denying Barnes’ juror misconduct claim without applying a presumption of prejudice and ordering a Remmer hearing.
C.
Substantial and Injurious Effect or Influence
Despite our conclusion that the MAR Court’s adjudication of Barnes’ juror misconduct claim was an unreasonable application of clearly established federal law, “we are not permitted to grant habeas relief unless we are convinced that the error had a ‘substantial and injurious effect or influence in determining the jury’s verdict.’ ” Fullwood, 290 F.3d at 679 (quoting Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). This means that before we can grant habeas relief, we must conclude that the MAR Court’s error “actually prejudiced” Barnes. Bauberger, 632 F.3d at 104. “If we are in ‘grave doubt’ as to the harmlessness of an error, the habeas petitioner must prevail.” Fullwood, 290 F.3d at 679 (citing O’Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)). “‘Grave doubt’ exists when, in light of the entire record, the matter is so evenly balanced that the court feels itself in ‘virtual equipóse’ regarding the error’s harmlessness.” Id.
In the district court’s assessment, Barnes’ allegations failed to demonstrate that Juror Jordan’s contact with Pastor Lomax had a substantial and injurious effect or influence on the jury’s verdict. This conclusion, however, was based on the district court’s erroneous holding that the MAR Court did not unreasonably apply clearly established federal law in denying Barnes a presumption of prejudice and a Remmer hearing. Moreover, given the state court’s complete failure to investigate Barnes’ juror misconduct claim, the district court had no basis from which to determine whether Juror Jordan’s communication with her pastor was harmless.
Based on the record before us, it is unclear whether Barnes can demonstrate actual prejudice or whether the MAR Court’s unreasonable application of federal law was harmless. See Fullwood, 290 F.3d at 682 (“Given the paucity of the record and the lack of any factual findings, ... we are unable to determine whether an outside influence upon [the juror] had a ‘substantial and injurious effect or influence in determining the jury’s verdict.’ ” (quoting Brecht, 507 U.S. at 637, 113 S.Ct. 1710)). What is clear, however, is that Barnes must be given the opportunity to prove actual prejudice. Accordingly, we will remand for the district court to conduct an evidentiary hearing solely on the issue of whether the state court’s failure to apply the Remmer presumption and failure to investigate Juror Jordan’s contact with Pastor Lomax had a substantial and injurious effect or influence on the jury’s verdict. See id.; Hall, 692 F.3d at 807 (explaining that the court is “uncertain as to whether [the habeas petitioner] was actually prejudiced by the state courts’ constitutional error, given the dearth of information before [the court]” and remanding for a hearing on actual prejudice).
As the Seventh Circuit has recently explained, “[t]he Remmer presumption is meant to protect against the potential Sixth Amendment harms of extraneous information reaching the jury, but a state court’s failure to apply the presumption only results in actual prejudice if the jury’s verdict was tainted by such information.” Hall, 692 F.3d at 805. Barnes will not be entitled to the Remmer presumption in attempting to make this showing because the presumption does not apply in the federal habeas context when proving a substantial and injurious effect or influ *253 ence on the jury’s verdict. See Lawson, 677 F.3d at 644 (citing Vigil v. Zavaras, 298 F.3d 935, 941 n. 6 (10th Cir.2002)). Therefore, to be entitled to habeas relief, Barnes will need to affirmatively prove actual prejudice by demonstrating that the jury’s verdict was tainted by the extraneous communication between Juror Jordan and Pastor Lomax.
IV.
Pursuant to the foregoing, the judgment of the district court is reversed, and this matter is remanded to the district court for an evidentiary hearing to determine whether the state court’s failure to apply the Remmer presumption and its failure to investigate Barnes’ allegations of juror misconduct in a hearing had a substantial and injurious effect or influence on the jury’s verdict.

REVERSED AND REMANDED

. The Supreme Court of North Carolina summarized the facts underlying Barnes' conviction in its opinion denying Barnes relief on direct appeal. See State v. Barnes, 345 N.C. 184, 481 S.E.2d 44, 51-53 (1997), cert. denied, 523 U.S. 1024, 118 S.Ct. 1309, 140 L.Ed.2d 473 (1998).

. Citations to the "J.A.” refer to the Joint Appendix filed by the parties in this appeal.

. A MAR is North Carolina's procedural mechanism for state post-conviction review. See N.C. Gen.Stat. §§ 15A-1401, 1411. Although a "MAR is not identical to a habeas corpus petition, ... it provides an avenue to obtain [post-conviction] relief from ‘errors committed in criminal trials.’ " Conaway v. Polk, 453 F.3d 567, 576 n. 8 (4th Cir.2006) (quoting N.C. Gen.Stat. § 15A-1401).

. For simplicity, we refer to the most current version as the "MAR.”

. For purposes of Barnes' habeas petition, we assume the truth of the factual allegations contained in his evidentiary affidavits presented to the MAR Court. See Robinson v. Polk, 438 F.3d 350, 358 (4th Cir.2006) (citing Bacon v. Lee, 225 F.3d 470, 485 (4th Cir.2000)).

.On June 1, 2000, Juror Jordan signed the bottom of the Interview Summary, acknowledging, "[t]he summary is an accurate description of what [she] said to Janine Crawley and Alexander McCoy [members of Barnes' direct appeal team] on May 31, 1995.” J.A. 1898.

. Pursuant to North Carolina law, a claim is "procedurally barred” for purposes of MAR review if, among other things, "[t]he ground or issue underlying the motion was previously determined on the merits upon an appeal from the judgment or upon a previous motion or proceeding in the courts of this State or a federal court.” N.C. Gen.Stat. § 15A-1419 (a)(2). As we have recognized, "[ajlthough North Carolina courts refer to the subsection 15A-1419(a)(2) bar as a 'procedural bar' for purposes of reviewing a state court defendant's MAR, it is not a state procedural bar for purposes of federal habeas review.” Brown v. Lee, 319 F.3d 162, 170 n. 2 (4th Cir.2003). Subsection (a)(2) simply precludes MAR review — not federal habeas review — of a claim that was previously raised by a state defendant and rejected on the merits. Id. (explaining that subsection (a)(2) "states a rule of res judicata and law of the case, precluding re-litigation of the claim [through] the MAR proceeding”). Therefore, we are not precluded from reviewing Barnes’ juror misconduct claim.

. In his Opening Brief, Barnes requested an additional COA from this Court, seeking consideration of a claim relating to a Batson violation. See Batson v. Kentucky, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (prohibiting purposeful racial discrimination in jury selection as a violation of the Equal Protection Clause). We denied Barnes' request for an additional COA and struck the Batson claim from Barnes’ brief.

. Barnes argued in the district court that the MAR Court “failed to adjudicate the merits of [his] properly presented claim and, thus, [the district court] must review [his claim] de novo.” J.A. 2135 n.7. However, as the district court correctly concluded, the MAR Court did in fact adjudicate the merits of Barnes’ juror misconduct claim. Indeed, the MAR Court concluded that the claim was “procedurally barred and without merit” because it "was presented in [his] direct appeal ... and was directly addressed by the Supreme Court of North Carolina and rejected by that court.” Id. at 1882-83. With respect to Barnes' new evidence, the MAR Court noted that it "add[ed] nothing to the issue as it was presented during [Barnes’] original appeal.” Id. at 1883. The MAR Court therefore incorporated the "same analysis inherent in [the direct appeal]” to the new evidence. Id. This was an adjudication on the merits, though it was done summarily and by incorporating the Supreme Court of North Carolina's earlier analysis. See Bell v. Jarvis, 236 F.3d 149, 163 (4th Cir.2000) (en banc) (explaining that even a summary adjudication, where “the state court fails to articulate the rationale behind its ruling,” is an adjudication on the merits for purposes of § 2254(d) deference).

. We may also grant relief if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d)(2). Subsection (d)(2) is not implicated in this appeal.

. As we have observed, the rules of evidence “make it difficult for either party to offer direct proof of the impact that an improper contact may have had on the deliberations of the jury." Stockton, 852 F.2d at 743-44; see also Robinson, 438 F.3d at 359-60. This is because both the Federal Rules of Evidence and the North Carolina Rules of Evidence prohibit a juror from testifying about his or her mental processes concerning the verdict. See Fed.R.Evid. 606(b); N.C. Gen.Stat. § 8C-1, Rule 606(b). There is an exception, however, that permits a juror to testify about "whether extraneous prejudicial information was improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear on any juror.” N.C. Gen.Stat. § 8C-1, Rule 606(b); see Fed. R.Evid. 606(b).

. See also United States v. Sandalis, 14 Fed.Appx. 287, 289 (4th Cir.2001) (unpublished per curiam) (citing Remmer and explaining that "when a party makes a threshold showing that improper external influences came to bear on the decision-making process of a juror, an evidentiary hearing on juror bias not only is allowed under Federal Rule of Evidence 606(b), but is required”).

. Whether the Remmer presumption has been altered or diminished by Phillips and Olano, as described above, does not affect our conclusion that the Remmer hearing requirement is clearly established federal law. In Phillips, the Supreme Court actually reinforced the hearing requirement as an independent remedy, explaining that the "Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.” Id. at 215, 102 S.Ct. 940. In Olano, because the defendants never requested a hearing to determine whether the presence of alternate jurors during deliberations influenced the verdict, the Supreme Court did not need to decide "whether the courts of appeals have authority to remand for Remmer-liks hearings on plain-error review.” 507 U.S. at 740, 113 S.Ct. 1770.

. For his part, Pastor Lomax "could not recall the conversation recounted by [Juror] Jordan.” J.A. 1893. He stated, however, "that it [was] possible that he did talk to [Juror Jordan] about the death penalty while she was a juror, but he simply does not remember it.” Id.

. As we have previously noted, Stockton was a 28 U.S.C. § 2254 case in which we applied Remmer. See Fullwood, 290 F.3d at 678. There, we explained that "when a habeas petitioner bases a juror bias claim on improper communication between, or improper influence exerted by, a nonjuror upon a juror, ... he ‘must ... establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict.’ ” Id. (quoting Stockton, 852 F.2d at 743).

. The dissent suggests that "it would not be ‘objectively unreasonable’ for the state court to limit the scope of 'the matter pending before the jury’ to communication or contact suggesting how the juror should vote in a particular case.” Post at 261. In the dissent’s view, "[t]he North Carolina state MAR [CJourt could reasonably conclude that the type of communication at issue here did not constitute contact 'about the matter pending before the jury’ because it was not directed to the choice of sentence, life in prison or death, that the jury was ultimately charged to determine.” Id. at 262. We could not disagree more. Indeed, Barnes' allegations satisfy even this arguably more stringent standard offered by the dissent. The alleged conversation at issue here was prompted by a defense argument concerning the consequences for a juror who votes to impose a death sentence for Barnes and his codefendants. Juror Jordan and Pastor Lomax "discussed the [defense] lawyer’s argument,” and Pastor Lomax "told [Juror] Jordan about another biblical passage which contradicted the passage relied upon by the defense attorney.” J.A. 1892. Thus, Pastor Lomax’s communication bore *250 directly on the very decision facing Juror Jordan — whether to impose the death penalty. Even under the dissent's proposed iteration of the relevant standard, it is hard to see how this communication does not "suggest!] how the juror should, vote in a particular case,” see post at 261, or how the communication "was not directed to the choice of sentence, life in prison or death,” see post at 262.