**PUBLISHED**

FILED: December 18, 2019

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 18-5
(1:08-cv-00271-TDS-JEP)
_____

WILLIAM LEROY BARNES

Petitioner - Appellant

v.

EDWARD THOMAS, Warden, Central Prison, Raleigh, North Carolina

Respondent - Appellee

_____

O R D E R
_____

The court denies the petition for rehearing and rehearing en banc.

A requested poll of the court failed to produce a majority of judges in regular active service and not disqualified who voted in favor of rehearing en banc. Chief Judge Gregory, Judge Motz, Judge King, Judge Keenan, Judge Wynn, Judge Diaz, Judge Floyd, Judge Thacker, and Judge Harris voted to deny rehearing en banc. Judge Wilkinson, Judge Niemeyer, Judge Agee, Judge Richardson, Judge Quattlebaum, and Judge Rushing voted to grant rehearing en banc.

Judge Wynn submitted a statement concurring in the denial of rehearing en banc.

Judge Agee and Judge Wilkinson each submitted statements dissenting from the denial of rehearing.  These statements are attached to this order.

Entered at the direction of Judge Floyd.

For the Court

/s/ Patricia S. Connor, Clerk

WYNN, Circuit Judge, concurring in the denial of rehearing en banc:

The question in this case is whether juror misconduct—seeking the religious advice of a pastor about the death penalty during jury deliberations and then relaying that communication to fellow jurors—had a substantial and injurious effect or influence on the jury's decision to impose the death penalty on Petitioner Barnes. The question is not what legal standard applies. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) ("[W]e hold that the *Kotteakos* [*v. United States*, 328 U.S. 750 (1946)] harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type."). And the question is not whether this Court's previous decision in Barnes' favor was incorrect. *Barnes v. Joyner*, 751 F.3d 229 (4th Cir. 2014) (hereinafter *Barnes I*). And the question is not whether, systemically, federal courts grant too much habeas relief. Habeas relief does not operate on a quota system.

Again, to be absolutely clear: The question in this case is whether juror misconduct—seeking the religious advice of a pastor about the death penalty during jury deliberations and then relaying that communication to fellow jurors—had a substantial and injurious effect or influence on the jury's decision to impose the death penalty on Petitioner Barnes.

The facts show that it did.

The panel majority opinion presented a compelling account of what transpired. In a North Carolina court, a jury found Petitioner Barnes guilty of first-degree murder. *Barnes v. Thomas*, 938 F.3d 526, 529 (4th Cir. 2019) (hereinafter *Barnes II*). At closing arguments in the sentencing phase, an attorney representing a co-defendant argued that the jury, if it

3

imposed the death penalty, would be judged by God for violating one of the ten commandments, specifically, "Thou shalt not kill." *Id.* (quoting J.A. 1532). One of the jurors, Hollie Jordan, was offended by the argument and saw that another juror looked upset. *Id.* at 530. After the first day of deliberations, before the jury had reached a decision, Juror Jordan discussed the case—including a discussion of pictures of the crime scene—with her pastor and asked if the jurors would "burn in hell" if they imposed a death sentence. *Id.* at 531 (quoting J.A. 2269). She asked this question despite allegedly having already decided to vote for the death sentence.[1] *Id.* at 532. The pastor replied that the jurors would not burn in hell, gave her Bible verses to support his opinion, and told Juror Jordan that the jurors "had to live by the laws of the land." *Id.* at 531-32 (quoting J.A. 2271).

The very next day, Juror Jordan spoke with her fellow jurors about her conversation with the pastor. *Id.* at 532. She relayed to them that they would not "burn in hell," and she read the Bible verses her pastor had suggested. J.A. 2274. Another juror testified that she thought Juror Jordan "was trying to convince someone to -- it was okay to give him the death penalty."[2] J.A. 2295. The jury subsequently voted to impose the death penalty.

The unmistakable import of these facts is that Juror Jordan sought out her pastor's

---

[1] There is some dispute whether Juror Jordan's testimony that she was not asking her pastor how to vote was admissible. *Id.* at 532, 535. As the panel majority opinion explains though, crediting this testimony does not change the conclusion of prejudice here. *Id.* at 535. If anything, it makes the conclusion inescapable.

[2] Juror Jordan herself previously indicated she intended to "remedy the effect of the [defense counsel's] argument." *Barnes I*, 751 F.3d at 235 (quoting a summary of a 1995 interview with Juror Jordan, which was signed in 2000 by Juror Jordan as an accurate description of what she said).

4

opinions about the death penalty and then presented those opinions to her fellow jurors for the purpose of influencing another juror's vote. She solicited an authoritative outside opinion about sentencing, and the pastor gave her one. The prejudice is clear and meets the standard of "grave doubt" and "virtual equipoise." *Barnes II*, 938 F.3d at 534, 536 (quoting *Lawlor v. Zook*, 909 F.3d 614, 634 (4th Cir. 2018)).

Nevertheless, the dissent contends that "the record here shows only a conversation that did not touch upon Barnes' guilt or the appropriate sentence." Dissent of Agee, J., *infra* at 14. The argument is that the pastor's communication was "of such a neutral and tangential nature to the issue before the jury that it could not have had an 'injurious effect or influence' on the jury's sentencing decision." *Barnes II*, 938 F.3d at 540 (Agee, J., dissenting) (quoting *Brecht*, 507 U.S. at 627). This requires accepting that the conversation about burning in hell for imposing the death penalty was not about the death penalty. *See* Dissent of Agee, J., *infra* at 14 ("Nor is there any evidence that the pastor opined about the morality of the death penalty generally . . . . [T]he conversation was limited to whether serving on a jury faced with the decision between life imprisonment and the death penalty may result in the juror 'burn[ing] in hell.'" (quoting J.A. 2273)).

Put simply, this part of the dissenting opinion's analysis divorces answer from question. The question of going to hell for imposing a sentence was not neutral and tangential to sentencing. It was a question about sentencing. Thus, the pastor's answer was about sentencing.

The dissenting opinion diverts attention from the natural reading of the pastor's answer by shifting focus to the pastor's advice to "live by the laws of the land." *Barnes II*,

5

938 F.3d at 541 (Agee, J., dissenting) ("Instead, the pastor noted the Bible instructed Christians to 'live by the laws of the land.'" (quoting J.A. 2273)). The dissenting opinion suggests this is comparable to a judge reiterating jury instructions, *id.* at 542-43 (citing *Crease v. McKune*, 189 F.3d 1188, 1190, 1192-94 (10th Cir. 1999)), or to "a casual, time-of-the-day greeting," *id.* at 543 (quoting *United States v. Day*, 830 F.2d 1099, 1104 (10th Cir. 1987)). But an instruction of a pastor to follow the law is not the same as the instruction of a judge to follow the law. A judge who explains the felony murder rule to a juror, *Crease*, 189 F.3d at 1190, is a secular legal authority speaking on secular legal matter. A pastor opining to a juror on the death penalty as it relates to God, the Bible, hell, and the "law of the land" is a religious authority speaking on a mixed religious-secular legal matter. These are not equivalent.

Moreover, it is unclear on the record what the pastor meant by "live by the laws of the land." Juror Jordan testified that the pastor's verses from the Bible "explained everything." J.A. 2271. Thus, to fully understand "live by the laws of the land," we need to know what else the pastor said. However, as the dissenting opinion rightly points out, the evidence does not pincite which Bible verses the pastor used to clarify his meaning. *Barnes II*, 938 F.3d at 541 n.5 (Agee, J., dissenting). But we do have information about their substance.

One juror recalled that one of the Bible passages that Juror Jordan read to the jury concerned "eye for an eye and tooth for a tooth." J.A. 2281. While we may not know whether the verse came from the Old Testament or the New Testament, *Barnes II*, 938 F.3d at 541 n.5 (Agee, J., dissenting), we do know that over twenty years later, the impact of the

6

pastor's curated verses was such that the part this juror remembered was "eye for an eye and tooth for a tooth." J.A. 2281. This statement suggests that equivalent retribution is the measure of an appropriate sentence. Artificially isolating the phrase "live by the laws of the land" to claim it impartially endorses North Carolina law ignores both the context of the question asked and the limited evidence we have about the rest of the pastor's answer. No evidence in the record supports the dissenting opinion's characterization that the pastor's views merely matched the laws of North Carolina and the jury instructions (which Juror Jordan violated by speaking with him); we know that different religious authorities interpret the same Biblical passages in different ways. "Live by the laws of the land," like the rest of the pastor's comments, expresses an opinion—one incompletely explained in the record but connected to "[an] eye for an eye"—about how the jurors should sentence the defendants.

Viewing the dissenting opinion as a whole—the way it splits the answer from the question, the way it treats a pastor like a judge, the way it purports to interpret "live by the laws of the land" without considering the accompanying gloss—the dissenting opinion treats the opinions of the pastor as legal authority rather than religious opinion. This approach might be understandable if prejudice could only be found on a material alteration of the facts or law by which the jurors determine an issue. *See Barnes II*, 938 F.3d at 544 (Agee, J., dissenting). Misconduct involving an officer of the court likely affects such matters. But this approach is unsound—as illustrated by this case—because, as the panel majority opinion correctly states, "a prejudicial influence need not take the form of a third party directly telling jurors how they should vote or introducing new facts or law for their

7

consideration." *Id.* at 536 (citing *Turner v. Louisiana*, 379 U.S. 466, 473-74 (1965)). By making assumptions on this incomplete record that ignore the diversity of religious views on the death penalty, and by not treating the pastor as a pastor, the dissenting opinion misses the forest while looking for a perfectly archetypal tree.

Ultimately, this case turned on the facts. On the facts, Barnes was prejudiced. Accordingly, I concur in denying the petition for rehearing en banc.

WILKINSON, Circuit Judge, with whom NIEMEYER, Circuit Judge, joins, dissenting from the denial of rehearing en banc:

I respectfully dissent from the denial of rehearing en banc for the reasons given so well by Judge Agee. *See Barnes v. Joyner*, 751 F.3d 229, 253-66 (4th Cir. 2014) (Agee, J., dissenting) ("*Barnes I*"); *Barnes v. Thomas*, 938 F.3d 526, 536-48 (4th Cir. 2019) (Agee, J., dissenting) ("*Barnes II*"). While this immediate appeal concerns a federal district court's determination regarding the existence vel non of actual prejudice, the panel decision ultimately flows from an earlier judgment that abrogated what should have been the final word of North Carolina's state courts. As Judge Agee aptly explained in *Barnes I*, there is not a colorable argument that the North Carolina Supreme Court decision as adopted by the MAR court amounted to an "unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Quite apart from the deference to state courts required under 28 U.S.C. § 2254(d), the result reached here does not comport with our constitutional design. State courts are obliged under the Fourteenth Amendment and Supremacy Clause to apply federal law. *Testa v. Katt*, 330 U.S. 386, 394 (1947). But federal courts are obliged under the rudimentary dictates of dual sovereignty to respect state court adjudications.

That, I think, is the gist of the constitutional bargain. That, to me, is the essence of our constitutional structure. To read the Suspension Clause in a manner at such perennial odds with the comity envisioned for our federal and state systems is not right.

Some time ago, Justice Paul Reardon of the Supreme Judicial Court of Massachusetts regretted "the effect of Federal habeas corpus proceedings on State courts."

9

He lamented the "humiliation of review from the full bench of the highest State appellate court to a single United States District Court judge" and how excessive federal habeas powers contributed in his view to the "growing denigration of the State courts and their functions in the public mind." Address at the Annual Dinner of the Section of Judicial Administration, American Bar Association, San Francisco, California, Aug. 14, 1972, pp. 5, 9, and 10.

In some ways, the problem has only grown worse. The wound is only salted when the rebuke to state judiciaries is administered by a federal appellate court under what is supposed to be a deferential standard. It must be grating in the extreme to state judges, who take their responsibility to apply federal law as solemnly as we do ours, to be upbraided as "unreasonable" jurists. 28 U.S.C. § 2254(d)(1). This is not the first case to do so, nor will it be by any means the last.

But we would do well to reflect in medias res on how far we have strayed and how much we have lost. Our Constitution, whether viewed originally or contemporaneously, can only weep when a coordinate judicial system is rendered routinely subordinate, as has happened here. AEDPA was meant to vindicate constitutional values but if AEDPA and the Constitution are working as here at cross purposes, then Congress's effort will go increasingly for naught.

Perhaps the relationship of federal and state courts should come down to the old saying: I'm OK—You're OK. It's a needed maxim for our day and time. I regret the fact that our fine court has passed up this opportunity to restore the constitutional, statutory, and decisional respect that our state court colleagues are due.

10

AGEE, Circuit Judge, with whom NIEMEYER, Circuit Judge, joins, dissenting from the denial of rehearing en banc:

I have twice previously expressed the reasons why William Leroy Barnes has failed to satisfy the high burden a state prisoner faces to obtain relief under 28 U.S.C. § 2254. Largely for the same reasons provided in the prior dissenting opinions, I now dissent from the Court's denial of en banc rehearing. *See Barnes v. Thomas*, 938 F.3d 526, 536 (4th Cir. 2019) (hereinafter *Barnes II*) (Agee, J., dissenting); *Barnes v. Joyner*, 751 F.3d 229, 253 (4th Cir. 2014) (hereinafter *Barnes I*) (Agee, J., dissenting).[1]

En banc rehearing was necessary to maintain uniformity with the Supreme Court and this Court's precedent concerning when a petitioner has demonstrated "actual prejudice" resulting from an error alleged to have occurred during trial. Because the full Court will not rehear the case, the panel majority's decision stands, granting Barnes relief despite his failure to come forward with any evidence that the error he complained of actually prejudiced him.

The facts are not in dispute. In 1992, a state jury sentenced Barnes and one co-defendant to death and another co-defendant to life imprisonment for their roles in the murders of an elderly couple. During closing arguments in the penalty phase, counsel for

---

[1] As explained in the *Barnes I* dissent, rehearing is also appropriate because the panel majority incorrectly held as a threshold matter in the prior appeal that the state court's adjudication of Barnes' claim was "contrary to, or involved an unreasonable application of," *Remmer v. United States*, 347 U.S. 227 (1954). 28 U.S.C. § 2254(d)(1); *see Barnes I*, 751 F.3d at 253–66; *Joyner v. Barnes*, 135 S. Ct. 2643 (2015) (Thomas, J., dissenting from the denial of certiorari). Judge Wilkinson's separate dissent from today's denial of rehearing discusses these important matters further and underscores how the Antiterrorism and Effective Death Penalty Act of 1996 mandates federal respect for state court adjudications.

11

one of Barnes' co-defendants urged the jury not to impose the death penalty because God's law prohibited capital punishment. Counsel elaborated that "true believer[s]" wanted God to welcome them "into the Kingdom of Heaven" for having obeyed God's commands, and he cautioned that they could not justify before God their decision to kill another human being just "because the laws of man said [they] could." J.A. 2374. For reasons not explained in the record, the State did not object and the court offered no instruction to the jury concerning this argument.

One evening during deliberations, a juror—Hollie Jordan—asked her pastor if the Bible said that jurors would "burn in hell" if they imposed the death sentence. J.A. 2269. The pastor told Jordan that the Bible taught that individuals should "live by the laws of the land" and provided her with "some scriptures in the Bible" to support that view. J.A. 2271. During the next day's deliberations, Jordan shared this conversation with her fellow jurors and read several of the Bible verses aloud. Neither Jordan nor the other two jurors who testified at the evidentiary hearing (Ardith Peacock and Leah Weddington) could recall which Bible verses were read. Jordan and Peacock testified that Jordan did not use this information to support or oppose the death penalty, either generally or with regard to Barnes and his co-defendants. Instead, they both characterized the discussion as affirming that the jurors were "doing [their] duty" in assessing an appropriate sentence under North Carolina law. J.A. 2291. Weddington was not asked about Jordan's conversation with her pastor, but was asked only whether she recalled Bible verses being read. When asked "what might have prompted the juror – the female juror to bring the Bible into the jury room," Weddington responded, "I *guess* she was trying to convince someone to – it was okay to

12

give [the defendants] the death penalty." J.A. 2295 (emphasis added). This is the sum total of the record.

After showing the other requirements for § 2254 relief, a petitioner such as Barnes must come forward with evidence that the complained-of error caused "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In *Brecht*, the Supreme Court reiterated that in the context of a habeas petition, "actual prejudice" means a showing that the error "had substantial and injurious effect or influence in determining the" sentence. *Id.*; *see Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002) (noting that to be entitled to habeas relief, the petitioner need to "demonstrate[] that the verdict was actually influenced by improper external influence"); *Tuggle v. Netherland*, 79 F.3d 1386, 1393 (4th Cir. 1996) (observing that in the context of an error during the penalty phase of a capital case, this means showing that the error had a "'substantial and injurious effect or influence' . . . on the jury's decision to sentence [the defendant] to death"). The record Barnes developed does not satisfy his burden to show that Jordan's third-party communication with her pastor had a "substantial and injurious effect or influence" on the jury's decision to impose the death penalty.

Most significantly, the communication did not improperly taint any juror with the pastor's assessment of the proper punishment in this case. Not every improper communication between a juror and non-juror will prejudice a defendant. Instead, courts have looked to whether the communication exposes jurors to a non-juror's opinion about the defendant's guilt or punishment. *E.g.*, *Parker v. Gladden*, 385 U.S. 363, 363–65 (1966) (per curiam) (concluding it would "blink[] reality not to recognize the extreme prejudice

13

inherent" in a bailiff telling several jurors that the defendant was "wicked" and "guilty," and that the courts would "correct it" if the jury made a mistake in finding the defendant guilty); *United States v. Maree*, 934 F.2d 196, 202 (9th Cir. 1991), *abrogated on other grounds by United States v. Adams*, 432 F.3d 1092 (9th Cir. 2006) (holding that actual prejudice was demonstrated where a juror "actively discussed" the case with her friends, who "presented . . . strong opinions concerning the proper outcome of" the case). In contrast to this kind of prejudicial third-party conversation, the record here shows only a conversation that did not touch upon Barnes' guilt or the appropriate sentence.

Jordan stated without contradiction that she did not ask the pastor "about what to do in the case," nor did he provide any such opinion to her. J.A. 2272. There is no evidence in the record that Jordan's pastor offered an opinion as to Barnes' guilt, whether he was deserving of the death penalty, or about the case and the defendants in general. Nor is there any evidence that the pastor opined about the morality of the death penalty generally, as Jordan testified that her pastor did not discuss whether "the Bible supported [or] didn't support the death penalty." J.A. 2273. Instead, the conversation was limited to whether serving on a jury faced with the decision between life imprisonment and the death penalty may result in the juror "burn[ing] in hell." J.A. 2273. And the pastor's response was limited to sharing that the Bible instructed individuals to "live by the laws of the land" and providing some verses in support of that principle. J.A. 2273.

Given the limited nature of Jordan's conversation with her pastor, it is unsurprising that the testimony Barnes elicited regarding Jordan's communication of that conversation was similarly limited. Specifically, Barnes provided no evidence that Jordan shared her

14

pastor's views on the proper sentence in this case or about the pastor or Bible's views on the death penalty. Peacock expressly testified that Jordan did not use the pastor's comments or Bible verses to support or oppose the death penalty. Weddington's testimony was even hazier and limited to her recollection that a female juror read several unspecified Bible verses during deliberations. And when asked what *might* have prompted Jordan to read the Bible, Weddington "*guess*[*ed*] she was trying to convince someone . . . it was okay to give him the death penalty." J.A. 2295 (emphasis added). By the statement's plain terms, Weddington was "guess[ing]" about Jordan's motive but offered no testimony about the contents of what Jordan said that might support her speculation. Consequently, Weddington's statement is pure conjecture and cannot demonstrate that Jordan's improper communication with her pastor had a "substantial and injurious effect or influence" on Barnes' sentencing.[2]

Courts have held that a petitioner may be able to satisfy the *Brecht* standard when the jury considers inculpatory evidence that was not presented at trial. *See Sherman v. Smith*, 89 F.3d 1134, 1142–43 (4th Cir. 1996) (holding that the defendant failed to demonstrate *Brecht* actual prejudice where a juror improperly took an unsupervised visit to the crime scene principally because it was "cumulative" of evidence about the crime

---

[2] Even Weddington's non-speculative testimony is limited to Jordan reading the Bible during deliberations. And because she could not recall which verses were read or whether they were from the Old or New Testament, this testimony is of no evidentiary value. To the extent that Barnes and the majority suggest improper external influence from the mere recitation or reading of the Bible during deliberations, the Supreme Court has never held that to be improper or violate the defendant's constitutional rights. Indeed, this Court has previously denied § 2254 relief to a state prisoner who asserted his rights were violated by such conduct. *Robinson v. Polk*, 438 F.3d 350, 366 (4th Cir. 2006).

scene admitted at trial); *see also Sassounian v. Roe*, 230 F.3d 1097, 1108–12 (9th Cir. 2000) (holding actual prejudice was shown when jury considered a telephone call that had not been discussed during the trial and which "directly related" to the defendant's motive). The third-party communication that occurred in this case did not improperly taint any juror with extra-record evidence on which to base their decision. Barnes presented no evidence that the pastor directly or indirectly exposed any juror to any new facts that bore upon their decision of what sentence to impose.

Further, the third-party communication in this case reinforced North Carolina law regarding how jurors were to undertake their sentencing duty. In contrast to what occurred here, courts have acknowledged that the *Brecht* standard may be satisfied if jurors consult third-party sources that alter their understanding of the law and thereby materially change the standard for assessing the prosecution's burden. *Accord Bauberger v. Haynes*, 632 F.3d 100, 107 (4th Cir. 2011) (holding no actual prejudice arose when the jurors consulted a dictionary to define several words used in the jury instructions because the definitions "fully conveyed the essence of North Carolina law" and did not materially affect the standard). Here, Barnes does not contend—nor could he—that jurors should not have applied "the law of the land" when determining his sentence. The pastor's communication and Jordan's reiteration of it reinforced the precise instruction the trial court had given to the jurors about their duty to apply North Carolina law. As such, the communication did not introduce an improper consideration into the deliberative process, nor did it expand the circumstances in which the jury could lawfully impose the death penalty on Barnes. Instead, the communication was neutral with regard to the deliberative choice before the

16

jurors and mirrored the jurors' instruction to follow North Carolina law. Accordingly, the communication cannot be said to have had an "injurious" effect on Barnes' sentencing.

Lastly, other facts reinforce the conclusion that the communication did not have a "substantial and injurious effect or influence" on the deliberative process. Significantly, the jury returned a split sentencing decision, recommending that the two defendants (including Barnes) who were identified as the individuals who shot the victims receive the death penalty and that the other defendant, who did not shoot, receive life imprisonment. This differentiation of the defendants during the same sentencing deliberation supports the conclusion that the jurors understood their duty under North Carolina law to individually assess the appropriate punishment for each of the defendants.

Courts have also looked to the timing and duration of any error as part of the actual prejudice assessment. *See, e.g.*, *Fitzgerald v. Greene*, 150 F.3d 357, 366 (4th Cir. 1998); *Marino v. Vasquez*, 812 F.2d 499, 506 (9th Cir. 1987). In this case, Jordan's conversation with her pastor lasted only a "few minutes" and she discussed that conversation during deliberations for fifteen to thirty minutes during a multi-day deliberation. J.A. 2271. All told, there is simply no evidence that the communications dominated the deliberative process or otherwise occurred at a critical time. These additional factors bolster the conclusion that the jurors decided on the appropriate sentence based on North Carolina's sentencing criteria, just as they should have.

Despite Barnes' failure to produce any evidence showing that Jordan's communication with her pastor satisfied the *Brecht* standard, the panel majority nonetheless granted Barnes relief. It improperly concluded that the pastor's communication

17

with Jordan must have advocated in favor of the death penalty when no evidence—none—exists to support that conclusion. The unrebutted testimony of Jordan and her two fellow jurors demonstrates that the pastor relayed no personal views about the appropriate punishment in this case nor did he directly or indirectly expose them to additional arguments for or against the death penalty. The only evidence in the record concerning the pastor's communication is that it relayed the view that jurors "had to live by the laws of the land." J.A. 2271. A juror following that principle would still face the choice of which sentence was appropriate under North Carolina law. In short, the communication could not have had a "substantial and injurious effect or influence" because it was neutral as to an appropriate punishment and reiterated the very instructions under North Carolina law given by the trial judge.

To correct the panel's misapplication of *Brecht*'s actual prejudice standard, the Court should have heard this case en banc. Therefore, I respectfully dissent. It will now be the Supreme Court's task to correct this error by reaffirming that the Court meant what it said in *Brecht* and *Remmer* and that lower courts are not at liberty to deviate from that precedent.